AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

FILED

MAR 0 6 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                    DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
) Case No.   **19MJ0964**
One iPhone 6, white in black case, with serial number )
DNPQ94MCGRYH, currently located at 10385 Vista )
Sorrento Parkway, San Diego, CA 92121 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC § 371 | Conspiracy |
| 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5 | Securities Fraud |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

FBI SA Stephanie Schuld
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/6/19

*Judge's signature*

City and state: San Diego, California     U.S. Magistrate Judge Linda Lopez
*Printed name and title*

# AFFIDAVIT

I, Stephanie Schuld, being duly sworn, state as follows:

## INTRODUCTION

**A.  Purpose of This Affidavit**

1. I make this affidavit in support of an application for a follow-on search warrant to seize additional items found on a cellular telephone belonging to Oliver Lindsay – an iPhone 6, white in black case, with serial number DNPQ94MCGRYH (the "Subject Telephone") – pursuant to a search warrant issued by the Honorable Barbara L. Major on December 14, 2018 in 18-mj-6297 (the "Prior Warrant").  This affidavit incorporates by reference the affidavit in support of the Prior Warrant, which is attached as Exhibit A.

2. On June 29, 2018, a grand jury sitting in the Southern District of California handed down an indictment against defendants Oliver Lindsay and Gannon Giguiere.  The indictment alleges, *inter alia*, that Lindsay and Giguiere conspired to commit securities fraud, and committed securities fraud, in connection with the stock of Kelvin Medical, Inc.  A superseding indictment, handed down on January 25, 2019, added manipulative trading in Kelvin Medical stock as an object of the conspiracy.

3. Lindsay and Giguiere were arrested on July 5, 2018.  They were both carrying cell phones, which were seized.[1]  The Subject Telephone is one of the cell phones seized from Lindsay.  Agents are reviewing exported data from the Subject Telephone to identify materials which are subject to seizure pursuant to the Prior Warrant.

4. Based on the information below, I submit that there is probable cause to believe that additional information from the Subject Telephone, not currently subject to seizure under the Prior Warrant, will contain evidence of the following crimes: conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371; and securities fraud (insider

---

[1] Defendant Giguiere's cell phone was searched pursuant to a separate search warrant, but agents were unable to access the content of the data on that phone.

trading), in violation of 15 U.S.C. §§ 78j(b), 78(ff), and Title 17 C.F.R., § 240.10b-5; as more fully identified in Attachment B.

5. All the conclusions and beliefs set forth in this affidavit are based on my training and experience, conversations with other agents who have extensive experience in securities fraud investigations, and my knowledge of the facts of this investigation. All of the dates, times, and amounts listed in this affidavit are approximate. This affidavit sets forth only the facts necessary to support the issuance of the requested search warrant; it does not include each and every fact known to me concerning this investigation.

**B.    Training and Experience**

6. I have been employed as a Special Agent with the Federal Bureau of Investigation ("FBI") since January 2010. I am currently assigned to the San Diego Division's financial crimes squad. Prior to working financial fraud cases, I spent more than four years investigating public corruption.

7. Before I joined the FBI, I received a Bachelor of Arts degree in business with an emphasis in accounting and finance from Bethel University. Following graduation, I was employed by a publicly-held Fortune 500 company as a Staff Accountant, Division Accounting Manager, and lastly, a Controller. While at this company I gained more than five years of experience compiling and analyzing financial information.

8. As a Special Agent, I received basic federal law enforcement training at the FBI Academy in Quantico, Virginia. My training at the FBI Academy included instruction in how to conduct searches in accordance with the Fourth Amendment, the drafting of search warrant affidavits, and the probable cause standard.

9. During my career as an FBI Agent, I have investigated various white collar crimes, including mail fraud, wire fraud, embezzlement, bribery, money laundering, public corruption, and conspiracy to commit these offenses.

# PROBABLE CAUSE

## C. Pump and Dump / Market Manipulation of Kelvin Medical Stock

10. As outlined in Exhibit A, there is probable cause to believe that defendants Lindsay and Giguiere were part of a conspiracy to commit securities fraud by engaging in a pump-and-dump and market manipulation scheme in connection with Kelvin Medical stock. That scheme is the subject of allegations in the indictment and superseding indictment in *U.S. v. Giguiere, et al.*, 18CR3071-WQH.

## D. Relevant Individuals and Entities

11. Oliver Lindsay - According to U.S. law enforcement databases, Lindsay is a Canadian citizen. According to Lindsay's statements during recorded phone calls, Lindsay primarily resides in Georgetown, Cayman Islands. Based on Lindsay's statements during recorded phone calls, Lindsay operated an offshore brokerage firm known as CMGT Capital Management ("CMGT"). According to documents obtained from FINRA, the securities regulator, CMGT, Inc., was an affiliate of CMGT. Based on the evidence gathered in this case, much of which is discussed below, I believe Lindsay was involved, along with Giguiere and others, in illegal insider trading in the stock of Long Island Iced Tea Corp. (ticker: LTEA).

12. Gannon Giguiere - Based on his recorded statements, a review of the website itself, and according to CHS, Giguiere has operated a stock promotion website called TheMoneyStreet.com since at least as early as 2016. Based on the evidence gathered in this case, some of which is discussed below, I believe Giguiere was involved, along with Lindsay and others, in illegal insider trading in LTEA stock.

13. CHS - CHS[2] has admitted to investigators that he has been involved in penny stock fraud for many years, and has had contact with many other repeat players in the

---

[2] In August 2017, the United States charged CHS in a sealed complaint with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, for his role in a scheme

industry. CHS states that, since at least as early as 2016, he was involved in the promotion of stocks through TheMoneyStreet.com. CHS and his associate, Giguiere, paid for advertisements on websites like Yahoo Finance, where a click on the ad links to a TheMoneyStreet.com landing page touting a particular stock. CHS is cooperating with the investigation, and has recorded conversations and captured evidence of written communications with Giguiere, Lindsay, and others regarding the manipulation of many stocks.

14. Long Island Iced Tea Corp. - A Form S-1 registration statement (the "LTEA Form S-1") submitted by LTEA to the Securities and Exchange Commission (SEC) on November 22, 2017 stated that the company was "engaged in the production and distribution of premium Non-Alcoholic Ready-to-Drink ('NARTD') beverages. We are currently organized around our flagship tea product under the brand Long Island Iced Tea®." LTEA's stock was publicly traded on the Nasdaq Capital Market. On December 21, 2017, the company disseminated a press release entitled "Long Island Iced Tea Corp. to Rebrand as 'Long Blockchain Corp.': Corporate Focus to Shift Towards Opportunities Strategic to Blockchain technology." LTEA's stock price increased significantly based on this press release. The company also changed its ticker symbol from LTEA to LBCC.

15. Eric Watson - According to the LTEA Form S-1, Eric Watson was a significant shareholder in LTEA in late 2017. The LTEA Form S-1 stated that Watson owned 1,502,821 LTEA shares, which represented a 15.1% beneficial ownership in the company, on or about November 20, 2017.

---

relating to the 2012 manipulation Cuba Beverage Company. When approached by agents, CHS agreed to cooperate, the arrest warrant was not executed, and the complaint was later dismissed without prejudice. CHS has entered into a cooperation agreement with the United States, has been advised that he will be charged for his role in the prior scheme at the conclusion of the investigation, and is cooperating in hopes that the United States will file a motion for downward departure under 18 U.S.C. § 3553 and/or § 5K1.1 of the Sentencing Guidelines.

### E. CHS's Communications with Defendants Lindsay and Giguiere

16. Communications recorded by CHS reveal that Giguiere and Lindsay discussed an overall plan, and the day-to-day execution, surrounding their scheme to manipulate the stock of Kelvin Medical, and to promote Kelvin Medical stock on TheMoneyStreet.com. These communications took place from at least as early November 2017 through on or about July 5, 2018.

### F. Review of the Subject Telephone Pursuant to the Prior Warrant

17. Since extracting data from the Subject Telephone, agents have been reviewing its contents in an effort to identify and seize the evidence described in Attachment B to the Prior Warrant. This review includes communications by, between or among Lindsay, Giguiere, and/or CHS.

18. During their review of these communications, agents identified several text messages conveying information regarding promotional efforts, including on TheMoneyStreet.com. Specifically, when agents searched the Subject Phone for records containing the term "TheMoneyStreet," the review platform they were utilizing displayed a text message "conversation" between Lindsay and Watson. The conversation included encrypted text messages that were exchanged between September 19, 2017 and December 23, 2017. Many of the text messages conveyed information directly relevant to efforts to promote stocks (*e.g.*, upcoming corporate announcements), and one text message in the conversation specifically linked to a TheMoneyStreet.com page. Because the topics and the timeframe of the conversation fell within the scope of the Prior Warrant, agents reviewed the conversation in detail.

19. Among other things, the record of the conversation between Lindsay and Watson (referred to herein as the "LTEA Plain View Materials") concerned TheMoneyStreet's promotion of LTEA, and draft press releases regarding a change in LTEA's business focus and strategic plan. One such draft LTEA press release stated that

5

"[t]he primary focus of the Company will now be the exploration of and investment into opportunities that leverage the benefits of blockchain technology. The Company will continue to operate its subsidiary, Long Island Brand Beverages, LLC, as a beverage business focused on the ready-to-drink segment of the beverage industry."

20. As set forth in greater detail below, the timing of the communications found in the LTEA Plain View Materials fit into a chronology that gives rise to probable cause to believe that defendants Lindsay and Giguiere engaged in a conspiracy to commit insider trading, and committed insider trading, in LTEA stock.

### G. Information Regarding Long Island Ice Tea Corp.

21. According to documents that the SEC obtained from LTEA through an administrative subpoena, LTEA had in place an insider trading policy that forbade insiders from using material, non-public information about the company to trade its stock, or to share such information with others for the purpose of trading its stock.

22. Based on a review of the contents of TheMoneyStreet.com, the website promoted the stock of LTEA in November 2017 under the URL http://www.themoneystreet.com/read-the-tea-leaves-time-to-go-long-in-the-ready-to-drink-market/ (the "LTEA Promotion"). Based on my training and experience, I know that the term "going long" often means engaging in a transaction that will increase in value if the subject industry or company experiences success (or is perceived as successful by market participants).

23. The LTEA Plain View Materials contain a November 14, 2017 text message from Watson to Lindsay. The text message attached a document entitled "Stater: Crypto IM Draft.pptx." The cover page of this document reveals that the document concerns "Stater Global Markets[:] Equity Investment Deck – Nov 2017." The remainder of the document discusses Stater Global Market's purported focus, background, and the "Crypto Currency Market Opportunity." The LTEA Plain View Materials further contain a text

message on November 16, 2017, that also attaches a document entitled "Stater: Crypto IM Draft.pptx," which appears to be a revision of the document that Watson sent to Lindsay on November 14, 2017.

24. On December 4, 2017, CHS recorded a call with Lindsay. On that call, Lindsay described his discussions with others regarding LTEA. Specifically, Lindsay stated to CHS: "The guy behind the deal, Eric, was trying to get me to find a Canadian vehicle to vend in a currency trader out of the U.K. called Stater ... Stater.com, or something like that. ... He thinks that he's got approval from a majority of the shareholders to vend in to LTEA as a blockchain deal and, like, add this like blockchain element to an existing currency trader. So it could be a massive press release, actually." Lindsay also stated on the call that "Gannon [Giguiere] should try to conserve as much of that budget as possible without burning his, uh, his, his relationships. Because we're going to need it when comes – I mean, it will be good to have it when we come out." Lindsay also stated to CHS: "When Eric is going around to ... shareholders, he's revealing a little bit to them. He's telling them that they're now [sic] inside information, they can't transact the stock, but there's gonna be some leakage there. Like, there's going to be some people that are going to start bidding the stock up." Lindsay also stated: "He thinks he can announce an LOI early next week." Based on my training and experience, and my knowledge of the investigation, I believe the term "vend in" refers to a merger of a public company (with stock that trades in the securities markets) and a private company; the term "budget" refers to money that has been or will be spent on TheMoneyStreet.com's promotion of LTEA and its stock; and the term "LOI" refers to a letter of intent surrounding a potential merger of LTEA with a block chain company.

25. On December 7, 2017, Giguiere sent an email to Lindsay, CHS, and a third party stating "Can you please proton me the deck and all supporting information around the Crypto transaction in LTEA?" Later the same day, Lindsay sent to Giguiere and CHS

an email attaching a document entitled "Crypto IM Draft.pptx." This document appears to be the same as the one that Lindsay received via text message from Watson on November 16, 2017.

26. According to communications found in the LTEA Plain View Materials, defendant Lindsay sent an encrypted text message to Watson with a link to the LTEA promotion on TheMoneyStreet.com on November 16, 2017.

27. According to communications found in the LTEA Plain View Materials, on December 9, 2017, Lindsay sent an encrypted text message to Watson. The message forwarded what appears to be a message Lindsay had received from a third party. Lindsay also stated the following: "Getting really embarrassing to receives [sic] notes like this from clients, especially when it's happened days ago and I sound like I haven't a clue. Asking wtf I've gotten them in to. […] This things getting cornered into a toxic spiral. Chance of an LOI saving it … slim. Some other magic ace going to save it!?"

28. According to communications found in the LTEA Plain View Materials, on December 19, 2017, at 3:58 P.M.,[3] Watson sent defendant Lindsay an encrypted text message attaching a document entitled "LIIT Press Release_Block Chain_v2.docx." This document concerned transitioning the company to focus on block chain technology.

29. According to communications found in the LTEA Plain View Materials, on December 19, 2017, at 7:57 P.M., Watson sent Lindsay an encrypted text message attaching a document entitled "LIIT Press Release_Block Chain_v4 clean.docx." This version of the press release also concerned transitioning the company to focus on block chain technology.

30. According to communications found in the LTEA Plain View Materials, on December 20, 2017, at 4:02 A.M., Watson sent defendant Lindsay an encrypted text message attaching a document entitled "LIIT Press Release_Block Chain_v5 sw

---

[3] Pacific Time is used herein, unless otherwise noted.

8

clean.docx." This version of the press release also concerned transitioning the company to focus on block chain technology.

31. Lindsay sent a text message attaching a document entitled "LIIT Press Release_Block Chain_v5 sw clean.docx" to Giguiere and CHS on December 20, 2017 at 4:53 A.M. Between 5:37 A.M. and 6:11 A.M., Giguiere, Lindsay and CHS exchanged the following encrypted text messages:

*Giguiere: \*interesting*

...

*Giguiere: This release drops today, correct?*

*Lindsay: Should be now ... or post market*

...

*Lindsay: I guess we will know shortly*

*Giguiere: Yes*

32. According to FINRA, it conducted an investigation of possible insider trading in LTEA in and around December 2017. During its investigation, FINRA staff members obtained brokerage account documentation from LTEA's stock transfer agent, Continental Stock Transfer. This documentation shows that CMGT, Inc., acquired 332,500 LTEA shares in connection with an offering of shares by LTEA on November 16, 2017 (*i.e.*, CMGT Inc. did not purchase these shares in the market – rather, CMGT, Inc., received the shares from LTEA itself).[4]

---

[4] FINRA staff members also obtained account documentation from State Street Bank. According to FINRA, this documentation shows that CMGT, Inc., purchased 1,673 LTEA shares, and sold 2,000 LTEA shares on November 28, 2017; sold 12,000 LTEA shares on December 21, 2017, and purchased 9,800 LTEA shares between December 22 and December 26, 2017. FINRA calculated realized profits on these transactions of $40.

9

33. During its investigation, FINRA staff members obtained account statements and trade blotters for brokerage accounts held in the name of "Gannon K Giguiere," and in the name of Giguiere's wife, Lindsay Giguiere. Those materials show the following activity in these accounts on December 20, 2017:

(a) At or about 8:49 A.M., a brokerage account in the name of Gannon K Giguiere (the "Gannon Giguiere Brokerage Account"), held at Robinhood Financial LLC, purchased 17,500 shares of LTEA for approximately $42,350, for an average cost of $2.42 per share.[5]

(b) Between at or about 8:54 A.M. and 9:37 A.M., a brokerage account in the name of Lindsay Giguiere (the "Lindsay Giguiere Brokerage Account"), held at Scottrade, Inc., purchased 17,500 shares of LTEA for approximately $42,350, for an average price of $2.42 per share.[6]

34. The market for LTEA stock closed at $2.44 per share on December 20, 2017.

35. According to a chronology of events that LTEA submitted to FINRA for purposes of the referenced FINRA examination, at 5:32 A.M. on December 21, 2017, LTEA disseminated a press release (the "Blockchain Press Release") entitled "Long Island Iced Tea Corp. to Rebrand as 'Long Blockchain Corp.': Corporate Focus to Shift Towards Opportunities Strategic to Blockchain technology."

36. At 5:43 A.M. on December 21, 2017, Lindsay sent a text message to Giguiere and CHS stating "LT $11 On News."

---

[5] According to FINRA, the Robinhood Financial account statements gathered by FINRA also show that this account purchased 52,250 shares, and sold 98,770 shares between November 29, 2017 and December 27, 2017.

[6] According to FINRA, the Scottrade account statements gathered by FINRA also show that this account purchased 24,000 shares, and sold 51,750 shares between December 4, 2017 and December 27, 2017.

37. According to communications found in the LTEA Plain View Materials, on December 21, 2017, between 6:28 A.M. and 6:29 A.M., Watson and defendant Lindsay exchanged the following text messages:

*Watson: Smiling ?*

*Lindsay: Laughing ... Good job getting that done*

*Watson: Thanks. A fucking lot of brain damage. When the market sees the Stater deal we may have a $50 stock*

38. At 7:16 A.M. on December 21, 2017, Giguiere sent text messages to Lindsay and CHS stating "Nice pop in LT ... Amazing the hype around crypto ... The story will pull well on TMS ... are we going to continue with marketing for LT?" Based on my knowledge of this investigation, I believe that LT refers to LTEA, and TMS refers to TheMoneyStreet.com.

39. On the morning of December 21, 2017, the accounts of Giguiere and his wife sold the same volume of LTEA shares they had acquired the day before, *i.e.*, before the Blockchain Press Release was disseminated. More specifically, the brokerage account documents obtained by FINRA show that:

    a. Between 10:08 and 10:11 A.M., Gannon Giguiere Brokerage Account sold 17,500 shares of LTEA for approximately $125,925, at an average price of $7.20 per share.

    b. At or about 10:09 A.M., the Lindsay Giguiere Brokerage Account sold 17,500 shares of LTEA for approximately $121,726, at an average price of $6.96 per share.

    c. Cumulatively, the LTEA transactions in the Gannon Giguiere Brokerage Account and the Lindsay Giguiere Brokerage Account on December 20 and 21, 2017, produced proceeds of approximately $247,651, and generated gross profits of over $162,000.

40. According to a Form 10-K submitted by LTEA to the SEC on April 13, 2018, the company had been delisted from the Nasdaq Capital Market in February 2018. Specifically, the Form 10-K stated: "[O]n February 15, 2018, we received a notice from NASDAQ stating that NASDAQ had determined to delist our securities under the discretionary authority granted to NASDAQ pursuant to NASDAQ Rule 5101. The notification letter stated that NASDAQ believed that we made a series of public statements designed to mislead investors and to take advantage of public interest in bitcoin and Blockchain technology, thereby raising concerns about our suitability for exchange listing." I know from my training and experience that when NASDAQ delists a security, it may not trade on or through the NASDAQ Capital Market unless the associated company takes steps to relist the security.

## CONCLUSION

41. Based on the foregoing, there is probable cause to believe that Giguiere and Lindsay conspired to and did trade LTEA securities on the basis of material, non-public information, in violation of 18 U.S.C. § 371, 15 U.S.C. §§ 78j(b), 78(ff), and Title 17 C.F.R., § 240.10b-5. Further there is probable cause to believe that the items to be seized in Attachment B will be found on the Subject Telephone as described in Attachment A.

Respectfully submitted,

_____
Stephanie Schuld
FBI Special Agent

Subscribed and sworn to before me on March _b_, 2019

_____
HON. LINDA LOPEZ
United States Magistrate Judge

12

## ATTACHMENT A

PROPERTY TO BE SEARCHED

One iPhone 6, white in black case; currently in the possession of the Federal Bureau of Investigation, 10385 Vista Sorrento Parkway, San Diego, CA 92121 (the "Subject Telephone").

## **ATTACHMENT B**

### ITEMS TO BE SEIZED

Authorization to search the SUBJECT TELEPHONE described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the SUBJECT TELEPHONE. The seizure and search of the SUBJECT TELEPHONE will be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from the SUBJECT TELEPHONE will be electronic records, communications, and data such as emails, text messages, messages from text messaging applications like WhatsApp, messages and posts from social networking sites like Facebook, photographs, audio files, videos, and location data, for the period of November 1, 2017 to July 5, 2018:

a. Tending to identify attempts to trade the stock of Long Island Iced Tea Corp., its predecessors, successors and affiliates (collectively, "LTEA"), on the basis of material, non-public information, including attempts to:

1. Obtain material, non-public information regarding LTEA.

2. Pass on to others material, non-public information regarding LTEA.

3. Determine others who had, or did not have, access to material, non-public information regarding LTEA.

4. Determine the likely impact any material, non-public information regarding LTEA might have on the price or trade volume of LTEA stock.

5. Promote the stock of LTEA including through call rooms, newsletters, or websites, including but not limited to, www.TheMoneyStreet.com.

6. Identify payments, and the routing of payments, for the promotion of the stock of LTEA.

7. Buy or sell the stock of LTEA.

8. Distribute proceeds from the sale of the stock of LTEA.

b. Tending to identify accounts, profiles, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the trading of LTEA stock based on material, non-public information.

c. Tending to identify payment, payment methods, or other monetary transactions relating to the trading of LTEA stock based on material, non-public information.

d. Tending to identify co-conspirators, criminal associates, or others involved in the promotion or trading of LTEA stock based on material, non-public information.

e. Tending to identify travel to or presence at locations involved in the trading of LTEA stock based on material, non-public information.

g. Tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

h. Provide context to any of the communications, records, or data described above, such as electronic mail sent or received in temporal proximity to any relevant electronic mail.

**which are evidence of a** conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and securities fraud in violation of 15 U.S.C. § § 78j(b), 78ff, and 17 C.F.R. § 240.10b-5.

The seizure and search of the cellular phone(s) shall follow the procedures outlined in the Exhibit A.